IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ESSET TATE, JR.,                                   *

    Plaintiff,                                 *

v.                                                 *              Civ. No. JKB-24-01153

FRANK BISIGNANO,                                   *

    Defendant.                                 *

\*    \*    \*    \* .    \*    \*    \*    \*    \*    \*    \*    \*

## MEMORANDUM

Plaintiff Esset Tate, Jr., has brought this Title VII employment action against Frank Bisignano in his capacity as Commissioner of the Social Security Administration ("SSA").[1] Tate, an African American man, alleges that SSA discriminated against him because of his race and sex, in violation of 42 U.S.C. § 2000-e(2)(a), by denying him promotions on nine occasions between 2007 and 2017. He further alleges that these denials of promotion also constituted retaliation against him for complaining of discrimination, in violation of 42 U.S.C. § 2000e-3(a).

Now pending before the Court is SSA's "Motion to Dismiss Or, in the Alternative, for Summary Judgment" (the "Motion"). (ECF No. 6.) For the following reasons, the Motion, construed as a motion to dismiss, will be granted in part and denied in part.

## I.    BACKGROUND[2]

Tate began working at SSA in 1985, and was employed by the agency for over thirty years until his retirement in 2018. (Compl., ECF No. 1 ¶ 54.) He began his SSA career at the GS-5

---

[1] This action was originally brought against then–SSA Commissioner Martin O'Malley. Pursuant to Federal Rule of Civil Procedure 25(d), Frank Bisignano, who has since been sworn in as SSA Commissioner, is automatically substituted as the proper defendant.

[2] The Court assumes the truth of Tate's allegations for the purpose of resolving this Motion.

grade,[3] and steadily rose through the ranks through his first fourteen years of employment until, by 1999, he reached the GS-14 grade. (*Id.* ¶¶ 65–71, 76.) During this same time period, Tate joined SSA's Black Affairs Advisory Council ("BAAC") and rose to becoming the BAAC's National Chairperson from 1997 through 2000. (*Id.* ¶¶ 72–75.)

After Tate had attained the GS-14 grade, his career plateaued. From 1999 until his retirement, he held several different GS-14–level management positions within SSA, including as deputy division director of the Office of Disability Operations and of the Office of Earning Operations, and as "Program Manager/Team Leader" in the Office of Public Service and Operations Support. (ECF No. 1 ¶¶ 80–92.) However, in the eighteen years in which Tate was at the GS-14 grade, he "was unable to achieve a promotion from GS-14 to GS-15, . . . despite applying for roughly 50 positions." (*Id.* ¶ 2.)

**A. The Challenged Incidents**

In this action, Tate "is not contesting every non-selection, . . . only those that he believes clearly show discrimination and retaliation." (ECF No. 1 ¶ 3.) The nine challenged non-selections are as follows. The amount of factual detail alleged regarding these incidents varies widely, as is reflected in the uneven length of the Court's recitation of the alleged facts.[4]

---

[3] The GS grade refers to one's pay scale within the General Schedule, which establishes the salary level for most employees in the federal civil service. The GS scale runs from GS-1 (lowest) to GS-15 (highest). *See General Schedule Overview*, U.S. Off. of Pers. Mgmt., https://www.opm.gov/policy-data-oversight/pay-leave/pay-systems/general-schedule/ [https://perma.cc/6SVC-ZBHP].

[4] The Complaint also contains allegations regarding a posting for a GS-15–level job with the announcement code B-3411. (ECF No. 1 ¶¶ 131–34.) Tate alleges that a white woman named Margaret Boyle was selected for the position, and that the hiring officials were aware of Tate's prior equal employment opportunity activities. (*Id.*) But the Complaint does not allege when this incident occurred, nor does it allege that Tate applied for this position, and furthermore, this incident is not included in the "Claims" section of the Complaint. (*See id.* ¶¶ 167–184.) So, the Court does not understand Tate to be bringing any claims for discrimination or retaliation with respect to his non-selection for the B-3411 position.

### 1. Non-Selection One (January 2007)

In January 2007, SSA declined to select Tate for the position of "GS-15 Supervisory and Program Analyst, Job Announcement B-3354." (ECF No. 1 ¶ 167.) The hiring officials for this position were Linda McMahon and Carolyn Simmons, a white and black woman, respectively. (*Id.* ¶¶ 94–96.) Both McMahon and Simmons "were aware of Mr. Tate's prior EEO [equal employment opportunity] activity." (*Id.* ¶ 97.)

Tate made the "Best Qualified List" ("BQL") but was not interviewed. (ECF No. 1 ¶ 98.) Instead, the position went to a white man named Philip Bryant. (*Id.* ¶ 99.)

At the time of this non-selection, Tate had "more supervisory experience," including being responsible for supervising more than 500 employees, whereas Bryant "had never supervised more than 15 employees above the GS-13 level." (ECF No. 1 ¶¶ 100–02.) Moreover, Bryant had previously been demoted from the GS-15 level to the GS-14 level "because of allegations of sexual harassment," but McMahon determined that Bryant had since been "rehabilitated." (*Id.* ¶¶ 103–04.) McMahon determined that "Bryant had outstanding organizational, negotiation, and interpersonal skills (notwithstanding the allegations of sexual harassment)." (*Id.* ¶ 105.)

### 2. Non-Selection Two (August 2007)

In August 2007, SSA declined to select Tate for either of two openings for the position of "GS-15 Supervisory Management and Program Analyst (Senior Budget Advisor), Job Announcement F-980-USAS." (ECF No. 1 ¶ 169.) For this position, the hiring officials were McMahon and Mark Blatchford, a white man. (*Id.* ¶¶ 109–110.) Both were aware of Tate's prior EEO activities. (*Id.* ¶ 111.)

The position was advertised twice, and Tate applied both times. (ECF No. 1 ¶¶ 113–14.) However, the positions instead went to Lindsey Spear, a white woman, and Pat Perzan, a white

man. (*Id.* ¶ 112.) Tate and Perzan, but not Spear, were on the BQL for the first announcement; all three were on the BQL for the second announcement. (*ID.* ¶¶ 117–18.) Spear and Blatchford had worked together "for many years" and had "an excellent working relationship." (*Id.* ¶ 119.) "The Agency alleges that its selections were based on a need for specific budgetary knowledge." (*Id.* ¶ 120.)

### 3. Non-Selection Three (September 2007)

In September 2007, SSA declined to select Tate for the position of "GS-15 Supervisory Program Analyst (Division Director), F-983-USAS." (ECF No. 1 ¶ 171.) The hiring officials were again McMahon and Blatchford. (*Id.* ¶¶ 121–22.) They were both aware of Tate's prior EEO activities. (*Id.* ¶ 123.)

The position went to Tom MacBride, a white man. (ECF No. 1 ¶ 124.)

### 4. Non-Selection Four (April 2008)

In April 2008, SSA decline to select Tate for the position of "GS-15 Supervisory Management Analyst (Staff Director), Job Announcement SH-163240." (ECF No. 1 ¶ 173.) The hiring officials were McMahon and Jo Armstrong, also a white woman. (*Id.* ¶¶ 125–26.) Both were aware of Tate's prior EEO activities. (*Id.* ¶ 127.)

The position went to Jeffrey Caplan, a white man. (ECF No. 1 ¶ 128.) Caplan "had less than 15 months of experience at the GS-14 level," had "limited experience in the Operations component," and "did not provide direct support to front-line employees through Operations leadership." (*Id.* ¶¶129–30.)

### 5. Non-Selection Five (April 2009)

In April 2009, SSA declined to select Tate for the position of "GS-15 Social Science Insurance Specialist, SH-217977." (ECF No. 1 ¶ 175.) The hiring officials were Kelly Croft and

4

Marty Hansen, white men, and Dorothy Nettles, a white woman; all were aware of Tate's prior EEO Activities. (*Id.* ¶¶ 139–141.)

Two white women—Vickie Gregory and Carol Boyle—were selected for the role. (ECF No. 1 ¶ 142.)

### 6. Non-Selection Six (June 2009)

In June 2009, SSA declined to select Tate for the position of "GS-15 Supervisory Management Analyst, GS-0342015, advertised under VAN SH-28510." (ECF No. 1 ¶ 177.) There are no other allegations about this incident.

### 7. Non-Selection Seven (June 2013)

"[O]n or about June 6, 2013," SSA declined to select Tate for the position of "GS-15 Supervisory Management Analyst, Director of Division of Resources and Management Information, Job Announcement SH-849070." (ECF No. 1 ¶ 179.)[5] The hiring officials were Nancy Berryhill and Rosemary Stricks, both white women, and Erik Jones, a white man. (*Id.* ¶¶ 155–56.) All three were aware of Tate's prior EEO activity. (*Id.* ¶ 158.)

The position went to Michael Muller, a white man. (ECF No. 1 ¶ 159.) There are no allegations about Muller's qualifications, but Tate alleges that, as of his application for this position, Tate had "prepared staff guidance on issues needing external involvement, such as system requirement, security and facilities issues; and recommendations on work priorities which include[d] staffing and budget allocations." (*Id.* ¶ 160.)

### 8. Non-Selection Eight (June 2013)

On June 11, 2013, SSA declined to select Tate for either of two openings for the position

---

[5] Elsewhere in the Complaint, Tate states that this non-selection occurred on "June 6, 2011." (ECF No. 1 ¶ 27.) The sequencing of other events in the Complaint (such as Tate's filing of an EEO complaint about this incident in September 2013, (*see id.* ¶ 30)) leads the Court to conclude that the reference to "2011" is a typographical error, and that this incident occurred on June 6, 2013.

of "GS-15 Supervisory Program Analyst, Job Announcement SH-868791." (ECF No. 1 ¶ 181.) The hiring officials were again Berryhill, Stricks, and Jones. (*Id.* ¶¶ 144–145.) Jones was aware of Tate's prior EEO activities.[6] (*Id.* ¶ 146.)

Two individuals were hired. One was Judy Ockenfels, a white woman; the other was James Suhrcke, a white man. (ECF No. 1 ¶¶ 147, 152.) Suhrcke had "just over one year of experience at the GS-14 level"; Ockenfels's amount of experience is not alleged. (*Id.* ¶ 153.)

By this point, Tate had been "at the GS-14 level in [the Operations] division for almost 10 years," and had "helped the Agency accelerate more than 52 million one-time payments, totaling more than 13 billion dollars." (ECF No. 1 ¶ 148.) For this work, and for his work in disaster recovery relief, Tate "received Deputy Commissioner-level citations." (*Id.*) He also had a "wealth of knowledge which included recent leadership for SSA's fee and consent-based workload involving SSA number verifications and third-party requests for information; developing action plans for senior executive concurrence; and providing centralized support for regional and national issues." (*Id.* ¶ 154.)

### 9. Non-Selection Nine (July 2017)

In July 2017, SSA declined to select Tate for "a Special Assignment to the Office of Communications of the Small Business Administration (SBA)." (ECF No. 1 ¶ 183.)[7] Tate expressed his interest in a transfer to SBA to "his third-line supervisor, Janet Walker," a black woman. (*Id.* ¶ 162.) He viewed this assignment "as a final opportunity to burnish his credentials

---

[6] The Complaint also alleges that McMahon was aware of Tate's EEO activities, but does not allege that McMahon had any involvement in the hiring process for this position. (*See* ECF No. 1 ¶¶ 144–48.) There is no specific allegation that Berryhill or Stricks was aware of Tate's prior EEO activities. (*See id.*)

[7] Tate states that he "requested that he be detailed to the [SBA] at the Agency's request." (ECF No. 1 ¶ 161.) But the next sentence makes clear that the request to transfer to SBA was Tate's own. (*See id.* ¶ 162 (stating that "Tate conveyed his request" to his supervisor).) So, the Court understands the request to transfer to SBA as originating from Tate, not from SSA itself.

to obtain a GS-15 position." (*Id.*) Jones, who by this point was "Assistant Deputy Commissioner for Operations, SES," recommended to Walker that Tate be denied this assignment. (*Id.* ¶ 164.) Walker, however "claims she made the decision to deny Mr. Tate the detail." (*Id.* ¶ 166.)

Both Walker and Jones were aware of Tate's "race, sex, and EEO activity." (ECF No. 1 ¶ 165.)

## B. Procedural-History Allegations

As might be expected given the recitation of events stretching back to 2007, the procedural history of Tate's disputes with SSA is long and tortuous. The parties have been mired in litigation against each other, in one form or another, for the better part of twenty years.

The relevant procedural history began on May 24, 2007, when Tate filed a "formal EEO complaint" regarding Non-Selection One. (ECF No. 1 ¶ 13.) He subsequently amended his EEO complaint, first on October 9, 2007 (to add claims relating to Non-Selections Two and Three), and then again on June 6, 2008 (to add claims relating to Non-Selection Four). (*Id.* ¶¶ 14–18.) This complaint was assigned the case number "HQ-07-333 SSA." (*Id.* ¶ 19.) On July 3, 2009, Tate filed a separate EEO complaint relating to Non-Selection Five; this was assigned the case number "HQ-09-0514." (*Id.* ¶¶ 20–22.)

Meanwhile, Tate "was (and is still) a lead plaintiff in [an] EEO administrative class action," *Wilkerson v. SSA*, EEOC Case No. 531-2010-00081X, Agency. No. HQ-09-0514. (ECF No. 1 ¶ 24.) This is a "class action for discrimination in awards against Black Males at the Agency from April 7, 2003, to September 29, 2023." (*Id.* ¶ 60.) It is not clear from the complaint precisely when Tate joined the *Wilkerson* action, but the sequencing of the allegations in the Complaint imply that he joined the *Wilkerson* action in response to his January 2007 non-selection for the B-3354 position, and that he was already a member of the *Wilkerson* action by the time of his August

2007 non-selection for the F-980-USAS position. (*See id.* ¶¶ 106–07, 111.)

In January 2010, EEOC Administrative Judge Marlin Schreffler "dismissed without prejudice" all of Tate's pending EEOC complaints "and held them in abeyance pending adjudication of the class action complaint."[8] (ECF No. 1 ¶¶ 23, 25.) Judge Schreffler also "ordered [SSA] to preserve all records related to Mr. Tate's complaint(s) 'until final adjudication of the class complaint.'" (*Id.* ¶ 26 (quoting Order of Dismissal Without Prejudice, *Tate v. Commissioner, SSA,* EEOC Case No. 531-2010-00081X, Agency. No. HQ-09-0514 (Jan. 11, 2010)).)

Sometime on or after June 11, 2013, Tate "timely contacted an EEO counselor" regarding Non-Selections Seven and Eight. (ECF No. 1 ¶ 29.) He then filed a formal EEO complaint on September 13, 2013. (*Id.* ¶ 30.) This complaint, which was assigned the case number "HQ-13-0710," "was also held in abeyance pursuant to Judge Schreffler's Order." (*Id.* ¶ 31.)

In February 2015, an EEOC administrative judge "severed all non-selection claims, including Mr. Tate's[,] from the *Wilkerson* class action." (ECF No. 1 ¶ 32.)

A year later, in February 2016, Tate "received a copy of the ROI in Agency No. HQ-07-0333" (the case challenging Non-Selections One through Four) and "timely requested a rehearing on March 22, 2016." (ECF No. 1 ¶ 33.)

In January 2017, Tate "requested a hearing in Agency Case Number HQ-13-0710 [the case challenging Non-Selections Seven and Eight] and requested that it be consolidated with" his other pending cases challenging Non-Selections One through Five. (ECF No. 1 ¶ 34.)

Meanwhile, on October 19, 2017, Tate "filed his formal EEO complaint" regarding Non-Selection Nine, SSA's denial of his request to be detailed to the SBA. (ECF No. 1 ¶¶ 35–36.)

---

[8] The Complaint lists three EEOC complaints that were dismissed/held in abeyance at this time—case numbers "HQ-07-0333, HQ-08-172, and HQ-09-0514." (ECF No. 1 ¶ 23.) The Complaint contains one other brief reference to "HQ-08-172," (*see id.* ¶ 34), but does not otherwise explain what HQ-08-172 was about or how (if at all) that case related to the challenged incidents at issue in the instant action.

For the next several years, Tate continued litigating his case before the EEOC. (*See generally* ECF No. 1 ¶¶ 38–49.) In June 2018, he "requested an Acknowledgment and Order and stated that [his] claims included repeated reprisal." (*Id.* ¶ 38.) In November 2018, an EEOC administrative judge "issued an Acknowledgment and Order and initiated proceedings at the EEOC." (*Id.* ¶ 39.) In April 2020, Tate sought to amend his complaints "to include reprisal as a basis" for challenging SSA's actions. (*Id.* ¶ 41.) In January 2021 an EEOC administrative judge dismissed the complaints, erroneously (according to Tate) concluding that the cases had already been dismissed or had been found to lack a jurisdictional basis. (*Id.* ¶ 43.)

The case was later reassigned to a different EEOC administrative judge who, in September 2022, "dismissed the complaints and remanded them for a Final Agency Decision ["FAD"]." (ECF No. 1 ¶ 45.)

Tate appealed the dismissal of his complaints to the EEOC's Office of Federal Operations ("OFO") on November 23, 2021. (ECF No. 1 ¶ 47.) The OFO issued its decision on Tate's claims for race- and sex-based discrimination and retaliation on January 22, 2024. (*Id.* ¶ 49.)

Tate alleges that the relevant SSA decisionmakers involved in most of the nine non-selections were aware of his prior EEO activities, including his role in the *Wilkerson* action. (*See* ECF No. 1 ¶¶ 97 (alleging that the individuals in charge of hiring with respect to Non-Selection One were aware of Tate's prior EEO activities), 111 (same, for Non-Selection Two), 123 (Non-Selection Three), 127 (Non-Selection Four), 133 (the B-3411 position, *see supra* note 4), 141 (Non-Selection Five), 146, 151 (Non-Selection Eight), 158 (Non-Selection Seven), 163 (Non-Selection Nine). There is no specific allegation that decisionmakers were aware of Tate's EEO activities with respect to Non-Selection Six.

Tate filed the instant Complaint in this Court on April 21, 2024. (ECF No. 1 ¶ 50.) He

brings two Title VII claims with respect to each of the nine challenged Non-Selections—one each for race- and sex-based discrimination, and one each for retaliation—for a total of eighteen claims.

## II.    HOW TO CONSTRUE THE DISPOSITIVE MOTION

A threshold question in this matter is whether the Court should construe SSA's Motion as a motion to dismiss under Rule 12(b)(6) or as a motion for summary judgment under Rule 56.

### A.  Legal Standard

Where, as here, a defendant files a motion to dismiss or in the alternative for summary judgment, the Court has discretion as to how to construe it. *See Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 260–61 (4th Cir. 1998); *Head v. Rakowski*, 695 F. Supp. 3d 663, 676 (D. Md. 2023).  If the Court considers matters outside the pleadings (or outside a narrow category of documents integral to them), then the motion must be construed as one for summary judgment. *Head*, 695 F. Supp. 3d at 676 (citing Fed. R. Civ. P. 12(d)).  However, "[a] plaintiff may defeat summary judgment at this stage by filing an affidavit under Rule 56(d) attesting to his need to conduct discovery." *Id.* at 676–77.

It is usually the better practice for a court to decline to construe a dispositive motion as one for summary judgment if "the parties have not had an opportunity for reasonable discovery." *E. I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011).  This is especially true in employment-discrimination cases, where often "the main issue is one of motive and . . . most of the key evidence lies in the control of the moving party." *McCray v. Md. Dep't of Transp.*, 741 F.3d 480, 484 (4th Cir. 2014).  For this reason, courts in this District regularly decline to grant pre-discovery summary-judgment motions in employment-discrimination cases. *See, e.g., Hart v. Lew*, 973 F. Supp. 2d 561, 573–74 (D. Md. 2013); *Ensor v. Jenkins*, Civ. No. ELH-20-1266, 2021 WL 1139760, at *10 (D. Md. Mar. 25, 2021); *Lowman v. Md. Aviation Admin.*, Civ.

No. JKB-18-1146, 2019 WL 133267, at *9 (D. Md. Jan. 8, 2019); *Josiah v. Advanced Behav. Health, Inc.*, Civ. No. PX-18-0004, 2018 WL 3619537, at *3 & n.1 (D. Md. July 30, 2018).

At the same time, "the party opposing summary judgment cannot complain that summary judgment was granted without discovery unless that party had made an attempt to oppose the motion on the grounds that more time was needed for discovery." *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (citation omitted). The proper way to present this issue to the court is for the plaintiff to file an affidavit averring "that, for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d); *Harrods*, 302 F.3d at 244. This must do more than simply "demand discovery for discovery's sake." *See Gardner v. United States*, 184 F. Supp. 3d 175, 181 (D. Md. 2016). The plaintiff is also not entitled to discovery if "the additional evidence sought . . . would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Comm'y Coll.*, 55 F.3d 943, 954 (4th Cir. 1995). But when a plaintiff adequately explains why discovery is needed to prove her case, the Court should construe a pre-discovery dispositive motion as a motion to dismiss rather than one for summary judgment. *See McCray*, 741 F3d at 484.

### B. Analysis

Here, Tate has filed a declaration, pursuant to Rule 56(d), attesting to his need to conduct discovery (the "Tate Declaration").[9] (ECF No. 19-1.) Tate states that he "has not had the

---

[9] The Tate Declaration is not, strictly speaking, an affidavit. "An affidavit is a statement reduced to writing and the truth of which is sworn to before someone who is authorized to administer an oath." *Pfeil v. Rogers*, 757 F.2d 850, 859 (7th Cir. 1985) (citation omitted). The Tate Declaration is neither sworn, nor witnessed by a notary or similar official, nor does it "include the language required by 28 U.S.C. § 1746 for unsworn declarations," *United States v. Gray*, Civ. No. DKC-97-4287, 2012 WL 2370131, at *3 (D. Md. June 21, 2012). However, SSA does not raise this issue and indeed expressly refers to the Tate Declaration as an "affidavit" in its briefing. (*See* ECF No. 30 at 7.) And in any event, courts may excuse the failure to comply with the affidavit requirement when, as here, the party opposing discovery "adequately inform[s] the district court that the [summary-judgment] motion is pre-mature and that more discovery is necessary." *Harrods*, 302 F.3d at 245. Because SSA has waived any objection to this issue, the Court will exercise its discretion

opportunity to depose the witnesses, so is unable to assess their credibility." (*Id.* at 2.) He also lists nine categories of documents he plans to request in discovery. (*Id.* at 2–3.) These documents include "memoranda on Plaintiff or any of the selectees for any of the positions at issue" located in SSA personnel files, email communications regarding the challenged incidents, performance appraisals and disciplinary records for all candidates and selections, and interview notes and recordings regarding these incidents. (*Id.*) Tate also identifies eleven individuals involved in the challenged non-selections whom he plans to depose. (*Id.* at 3–4.) Tate states that he "needs this additional discovery to adequately respond to Defendant's Motion for Summary Judgment." (*Id.* at 4.)

SSA characterizes the Tate Declaration as "generalized" and "speculative," and states that Tate "has failed to identify any particular facts that he intends to discover." (ECF No. 30 at 7–8.) It also casts the document requests as "excessively broad and unduly burdensome." (*Id.* at 8.) Moreover, according to SSA, Tate "conveniently neglects to acknowledge that he could have, with due diligence, engaged in discovery during the administrative process." (*Id.*)

In arguing that the Tate Declaration is insufficient to avoid summary judgment, SSA likens the facts of this case to those in the Court's opinion in *Gardner*, 184 F. Supp. 3d. 175. There, the plaintiffs brought a wrongful-death action against the United States and certain individual prison employees, concerning an inmate's fatal heart attack at a federal prison. *See id.* at 177–80. The defendants filed a motion to dismiss, or, in the alternative, for summary judgment as to the plaintiffs' claims for deliberate indifference to the decedent's serious medical needs in violation of the Eighth Amendment. Against the plaintiffs' objections and despite an affidavit attesting to the plaintiffs' need to conduct discovery, the Court construed the motion as one for summary

---

to excuse Tate's failure to comply with the formal affidavit requirements under Rule 56(d), and will simply focus on the substantive sufficiency of the Tate Declaration.

judgment, and granted it. *Id.* at 178. In deciding to do so, the Court explained that the opportunity to file a Rule 56(d) affidavit "does not authorize fishing expeditions." *Id.* at 184 (cleaned up). The Court determined that the plaintiffs' discovery request essentially amounted to that, as they had "nothing more than speculation" to suggest that the defendants were subjectively aware of, much less recklessly disregarded, the decedent's serious medical needs, as would be needed to sustain a claim for deliberate indifference. *Id.* at 180–84; *see also Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016) (reciting the test for a deliberate-indifference claim under the Eighth Amendment).

SSA's reliance on *Gardner* is unavailing. *Gardner*—when applied outside the deliberate-indifference context—is the exception, not the rule. That case must be understood in the context of the "onerous" requirements for successfully proving a deliberate-indifference claim. 184 F. Supp. 3d at 192; *see Jackson v. Lightsey*, 775 F.3d 170, 178–79 (4th Cir. 2014) (referring to the test as "exacting" and setting a "high bar" for plaintiffs to clear). Because the *Gardner* plaintiffs' substantive burden was so heavy, the Court there understandably cast a gimlet eye over the plaintiffs' proposed discovery, closely scrutinizing whether the discovery sought would have a more-than-speculative possibility of adducing evidence sufficient to show the defendants' *mens rea*. Here, by contrast, the requirements for proving discrimination, while certainly not lax, are also "not onerous." *Rodgers v. Eagle Alliance*, 586 F. Supp. 3d 398, 433 (D. Md. 2022) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). Furthermore, the Court in *Gardner* was moved by the consideration that the individual defendants claimed qualified immunity. *See* 184 F. Supp. 3d at 185. As the Court recognized, qualified-immunity questions should be resolved as early as possible, because it provides defendants "a right, not merely to avoid standing trial, but also to avoid the burdens of . . . discovery." *Id.* (citation omitted). This consideration, which the Court found weighty in *Gardner*, is simply not at issue here, where there

13

is no right to qualified immunity asserted.

The Court determines that the appropriate course of action is to construe SSA's Motion as a motion to dismiss. The Tate Declaration lists specific items of evidence that he wishes to discover, and specific individuals that he wishes to depose. It is not speculative or implausible that the discovery sought could help him carry his claims past the summary-judgment stage. The Court recognizes, of course, that an extensive administrative record has already been compiled before the EEOC. In appropriate cases, a plaintiff's prior opportunity to conduct discovery in an EEOC proceeding will—notwithstanding the general reluctance to grant pre-discovery summary judgment in employment cases—suffice to defeat a Rule 56(d) affidavit request for further discovery. *See, e.g.*, *Agelli v. Sebelius*, Civ. No. DKC-13-497, 2014 WL 347630, at *10 (D. Md. Jan. 30, 2014). But here, Tate specifically asserts that, during the EEOC litigation, he was unable to conduct depositions, which are of course critically important in employment cases. Although SSA contends as a general matter that Tate could have been more diligent in pursuing discovery in his EEOC case, it does not specifically respond to—much less deny—Tate's assertion about depositions. In *McCray*, the Fourth Circuit expressly noted, in explaining why a plaintiff should have been permitted to take discovery after submitting a Rule 56(d) affidavit, that the plaintiff "had not had the opportunity to depose [her] supervisors" before the summary-judgment motion had been filed. 741 F.3d at 484. Because Tate was allegedly unable to avail himself of at least this important discovery device, summary judgment would be premature. *See Hart*, 973 F. Supp. 2d at 573–74 (denying a pre-discovery summary-judgment motion, despite a "voluminous" administrative record, when the plaintiff had not had an opportunity to conduct depositions); *Willar v. Esper*, Civ. No. GLR-19-2785, 2020 WL 6784470, at *5 (D. Md. Nov. 18, 2020) (similar).

Finally, the Court pauses to observe that the question of whether to permit a claim to

14

proceed to discovery need not be an all-or-nothing proposition. The Court has broad discretion in deciding whether and how to sequence, structure, and limit discovery as appropriate under the circumstances. *See Crawford-El v. Britton*, 523 U.S. 574, 598 (1998). In this case, the Court is well aware that there is already a lengthy administrative record compiled over many years. Given this reality, it would be inefficient and unnecessary to give the parties license to pursue the broad scope of discovery permitted in the ordinary case. The Court will direct the parties to meet and confer to discuss this record and jointly propose to the Court an appropriately narrow course of discovery with respect to the claims that still remain in the case after today's order.

## III.    STANDARD OF REVIEW

Having decided to construe SSA's Motion as a motion to dismiss, the Court now turns to the applicable standard. A Rule 12(b)(6) motion tests the sufficiency of a complaint's claims. *Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230, 234 (4th Cir. 2021). When considering a motion to dismiss pursuant to Rule 12(b)(6), the Court must "accept all well-pleaded allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor." *Langford v. Joyner*, 62 F.4th 122, 124 (4th Cir. 2023). However, conclusory allegations are not entitled to the assumption of truth, nor are legal conclusions couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 681 (2009). To survive a motion to dismiss, the complaint "must include 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Langford*, 62 F.4th at 124 (quoting *Iqbal*, 556 U.S. at 678 (2009)). In other words, the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In assessing a motion to dismiss, the Court limits its review to the complaint, documents attached to the complaint as exhibits, and documents that are integral to the complaint and whose authenticity is not disputed. *Reamer v. State Auto. Mut. Ins. Co.*, 556

15

F. Supp. 3d 544, 549 (D. Md. 2021).

## IV.    ANALYSIS

### A. Tate's Discrimination Claims

The Court now turns to whether Tate has adequately stated a claim for discrimination on the basis of race or sex with respect to the nine challenged non-selections.

#### 1.    Legal Standard for Title VII Discrimination

A plaintiff alleging discrimination under Title VII must plausibly allege facts that allow a court to reasonably infer that the plaintiff's employer "fail[ed] or refuse[d] to hire or to discharge [him], or otherwise . . . discriminate[d] against [him] with respect to his compensation, terms, conditions, or privileges of employment, because of [his] race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may prove discrimination either by producing "direct evidence" of discrimination, or by establishing a prima facie case. *Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010), *aff'd sub nom. Coleman v. Ct. of Appeals of Md.*, 566 U.S. 30 (2012). When the plaintiff's theory of discrimination is grounded in an employer's failure to promote him, a prima facie case requires a showing that (1) the plaintiff is a member of a protected class, (2) the employer had an open position for which he applied or sought to apply, (3) he was qualified for the position, and (4) he was rejected under circumstances that give rise to an inference of unlawful discrimination. *Evans v. Tech. Applications & Serv. Co.*, 80 F.3d 954, 959–60 (4th Cir. 1996). This is a "relatively easy test." *Id.* at 960 (citation omitted).

An employment-discrimination plaintiff need not plead a prima facie case to survive a motion to dismiss; instead, the plaintiff must simply plausibly allege facts that, taken as true, allow a court to draw a reasonable inference that the elements of a Title VII cause of action have been satisfied. *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 616–17 (4th Cir. 2020). But, the Court uses these

elements as a guide to help it determine whether a plaintiff's allegations are sufficient. *See Alessa v. Phelan*, Civ. No. DLB-21-0924, 2025 WL 974391, at *6 (D. Md. Mar. 31, 2025); *Yin v. CTI Consultants, Inc.*, Civ. No. 3:17-296, 2018 WL 1569486, at *6 (E.D. Va. Mar. 30, 2018).[10]

## 2. Discrimination Analysis

Here, with respect to all challenged incidents, there is no dispute that Tate is a member of at least one protected class, nor is there any dispute that he applied for the positions at issue.[11] And SSA expressly concedes that Tate was qualified for the positions. (*See* ECF No. 6-1 at 13.) Thus, the only question is whether Tate's Complaint raises the plausible inference that his non-selections occurred "because of" his race or sex.

The Court concludes that Tate's Complaint raises a plausible inference of race-based discrimination with respect to Non-Selections One, Four, and Eight (with respect to the hiring of Suhrcke only). The Complaint does not give the Court sufficient basis to infer race-based discrimination with respect to the other challenged Non-Selections. Moreover, there is no basis for the Court to infer that any of the Non-Selections involved discrimination against Tate on the

---

[10] On June 9, 2025, Tate filed a notice of supplemental authority, (ECF No. 31), directing the Court's attention to the Supreme Court's opinion issued on June 5 in *Ames v. Ohio Department of Youth Services*, 605 U.S. ___, 2025 WL 1583264 (2025). Tate asserts that in *Ames*, "the Court implicitly and Justices Thomas and Gorsuch explicitly in Justice Thomas's concurrence call into question whether the [*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)] burden shifting analysis is necessary or even appropriate in deciding summary judgment." (ECF No. 31 at 1–2); *see also Ames*, 2025 WL 1583264, at *2 ("assum[ing] without deciding that the *McDonnell Douglas* framework applies at the summary-judgment stage of litigation"); *id.* at *10–12 (Thomas, J., concurring) (criticizing the use of this framework at summary judgment). Here, the Court need not decide what effect, if any, *Ames* has on the continued applicability of *McDonnell Douglas* at summary judgment. That is so because the Court is construing SSA's Motion as a motion to dismiss, and it is well established that a plaintiff need not satisfy the *McDonnell Douglas* test to survive a motion to dismiss. *Holloway v. Maryland*, 32 F.4th 293, 298 (4th Cir. 2022).

[11] For Non-Selection Six, Tate does not expressly allege that he applied or sought to apply for the position. However, on a generous reading of the Complaint, the Court infers that he at least sought to apply for the position—otherwise, there would be no reason at all why Tate would challenge his non-selection for the position. In any event, as discussed below, his discrimination claims pertaining to Non-Selection Six must be dismissed for failure to plausibly raise any inference that his non-selection was causally related to his race or sex.

basis of his sex.

The Court begins with Non-Selection One. As discussed above, Tate alleges that, in January 2007, he applied for a GS-15 position and made the "Best Qualified List" ("BQL") but was ultimately not selected. Instead, the position went to Bryant, a white man with less supervisory experience and who had previously been demoted because of sexual-harassment allegations against him. Without deciding whether these facts would rise to the level of establishing a prima facie case, the Court concludes that they at least plausibly raise the inference that Tate's non-selection had to do with his race. *See McCleary-Evans v. Md. Dep't of Transp.*, 780 F.3d 582, 586 (4th Cir. 2015) (noting that an employment-discrimination plaintiff may adequately state a non-selection claim when selectee had substantially less experience and was less qualified than the plaintiff (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 (2002))). However, given that the selectee was *also* a man, and in the absence of any allegations about, for instance, either candidate's sexual orientation or gender identity, *see Bostock v. Clayton County*, 590 U.S. 644, 651 (2020), it is not clear how it would be logically coherent—much less plausible—to suppose that Tate was passed over for the promotion because of his sex.

For similar reasons, the Court holds that the Complaint adequately alleges racial discrimination with respect to Non-Selection Four and Non-Selection Eight (as it relates to Suhrcke). Starting with Non-Selection Four, Tate alleges that the selectee had "less than 15 months experience at the GS-14 level" and had "limited experience in the Operations component." (ECF No. 1 ¶¶ 128–30.) By that point—April 2008, (*see id.* ¶ 173)—Tate had nine years of experience at the GS-14 level, (*see id.* ¶ 76), and had been in roles in Operations components for nearly eight years, (*see id.* ¶ 80). Viewing the facts in the light most favorable to Tate, the Court can infer that—when a white person with substantially less experience was selected for a promotion instead

of a black person with much more relevant experience—the non-selection occurred because of Tate's race. And, turning to Non-Selection Eight in September 2013, Suhrcke—one of the two selectees—had "just over one year of experience at the GS-14 level" (*id.* ¶ 153), whereas Tate had by that point over fourteen years of GS-14 experience. That said, as with Non-Selection One, each of the selectees in Non-Selections Four and Eight was also male, so there is no basis to conclude that Tate's non-selection had anything to do with his sex.

The allegations with respect to each of the other Non-Selections, however, are deficient. These allegations are similar to ones that the Court of Appeals found wanting in *McCleary-Evans*. In that case, the plaintiff—an African American woman—applied for two promotions within the state highway administration. 780 F.3d at 583. Although she was allegedly "more than qualified" for both positions, the highway administration gave the positions to "non-Black candidates." *Id.* at 583. The Court of Appeals held that the plaintiff failed to plead facts giving rise to a plausible inference of invidious discrimination:

> The allegation that the Highway Administration did not hire her because its decision makers were biased is simply too conclusory. Only speculation can fill the gaps in her complaint—speculation as to why two "non-Black candidates" were selected to fill the positions instead of her.   While the allegation that non-Black decisionmakers hired non-Black applicants instead of the plaintiff is *consistent* with discrimination, it does not alone support a *reasonable inference* that the decisionmakers were motivated by bias. McCleary–Evans can only speculate that the persons hired were not better qualified, or did not perform better during their interviews, or were not better suited based on experience and personality for the positions. In short, McCleary–Evans' complaint stopped short of the line between possibility and plausibility of entitlement to relief.

*Id.* at 586 (cleaned up; emphasis in original).

Similarly, "only speculation" could allow the Court to infer that Tate was not selected for the promotions at issue in Non-Selections Two, Three, Five through Seven, and Eight (as to the position filled by Ockenfels). For each of these incidents, Tate makes no allegations about the

qualifications (or lack thereof) of the selectees. Without such allegations, the Court is left with the bare fact that Tate, a qualified applicant, applied for the promotions, but was not chosen. This is not enough to state a claim for discrimination. "Simply asserting that a Caucasian candidate was selected for a role over an individual within a protected class, without any facts indicating discrimination, cannot support a claim of intentional discrimination." *Tambedou v. Fundamental Clinical & Operations Servs., LLC*, Civ. No. DKC-19-2822, 2020 WL 5544199, at *4 (D. Md. Sept. 16, 2020). And, although Tate asserts in his Complaint that, "based on his race (African American) and his sex (male), the Agency discriminated against" him when it passed him over for each of these roles, (*see, e.g.*, ECF No. 1, ¶ 169), this is the kind of legal conclusion that the Court must disregard at the motion-to-dismiss stage. *See McCleary-Evans*, 780 F.3d at 585. Finally, as for Non-Selection Nine, there is no allegation that Tate was even eligible for a detail to SBA, let alone that he was entitled to one. Nor is there any allegation that the opportunity for the detail went to anyone else, or even that such details had occurred in the past. So, the Court can only speculate that he was denied this transfer for discriminatory reasons, as opposed to for the reason that he was simply not entitled to such a transfer.

Tate's race-based discrimination claims pertaining to Non-Selections One, Four, and Eight (as to the position filled by Suhrcke only) will be permitted to proceed to discovery. All other discrimination claims will be dismissed.

## B.  Tate's Retaliation Claims

### 1.  Administrative Exhaustion

Before turning to the substance of Tate's retaliation claim, the Court first takes up SSA's arguments that many of his retaliation claims are barred because he failed to exhaust his administrative remedies with respect to these *claims* before filing suit. (ECF No. 6-1 at 9–11.)

### i.  *Legal Standard for Administrative Exhaustion*

Title VII contains a mandatory, although non-jurisdictional, requirement that plaintiffs exhaust their administrative remedies by filing an administrative charge with the EEOC before filing suit in federal court. *Walton v. Harker*, 33 F.4th 165, 172, 175 (4th Cir. 2022). In general, "[t]he EEOC charge defines the scope of the plaintiff's right to institute a civil suit." *Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 132 (4th Cir. 2002). A plaintiff fails to exhaust when, for instance, "a charge alleges only racial discrimination but the complaint includes sex discrimination, or where a charge alleges only retaliation but the complaint alleges racial discrimination as well." *Sydnor v. Fairfax County*, 681 F.3d 591, 593–94 (4th Cir. 2012) (citations omitted).

Claims not expressly stated in the initial charge may nevertheless satisfy the exhaustion requirement if the claims were "reasonably related to the original [EEOC] complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent Title VII lawsuit." *Stewart v. Iancu*, 912 F.3d 693, 705 (4th Cir. 2019) (internal quotation marks and citation omitted). In other words, a Title VII plaintiff may press new claims in federal court "so long as they are like or reasonably related to" to claims raised in the charge "and grow out of the allegations during the pendency of the case before the agency." *Id.* (internal quotation marks and citation omitted). Ultimately, "[t]he touchstone for exhaustion is whether plaintiff's administrative and judicial claims are reasonably related, not precisely the same." *Sydnor*, 681 F.3d at 595 (cleaned up).

When deciding whether a claim has been adequately exhausted, courts should keep in mind that the EEOC process is "not simply a formality to be rushed through," *Chacko v. Patuxent Inst.*, 429 F.3d 505, 510 (4th Cir. 2005), but rather reflects Congress's policy decision that the work of eradicating invidious discrimination in the workplace should be steered first and foremost through

the relatively conciliatory and flexible administrative process, with recourse to the federal courts available only when administrative resolution is not successful.[12] *See id.*; *Balas v. Huntington Ingalls Indus., Inc.*, 711 F.3d 401, 407 (4th Cir. 2013).

Finally, the Court may properly consider a plaintiff's EEOC documents on a motion to dismiss, as these documents are integral to a plaintiff's claims (assuming, of course, that the documents' authenticity is not disputed). *Shigley v. Tydings & Rosenberg LLP*, 723 F. Supp. 3d 440, 449 n.5 (D. Md. 2024).

### ii. Administrative Exhaustion Analysis

Beginning with Non-Selection One, Tate expressly disclaimed *any* allegation of retaliation in his EEO charge. (*See* ECF No. 6-3 at 31 (August 2007 Tate declaration in response to an EEO initial investigation, in which he states, "I am not alleging retaliation.").) Because Tate clearly stated that he was not alleging retaliation during the EEO process, he did not give SSA or the EEOC a fair chance to investigate and respond to this allegation, and he cannot now raise that claim with respect to Non-Selection One. *See Sydnor*, 681 F.3d at 593 (observing that the exhaustion requirement seeks to give agencies "notice and an opportunity for an agency response" and to prevent "gamesmanship" on a plaintiff's part). This claim will be dismissed for failure to exhaust.

As for the remaining Non-Selections, the Court holds that Tate has met the exhaustion requirement, even though it is undisputed that Tate did not expressly allege retaliation in his original charges.

The Court reaches this conclusion for three reasons. First, a reasonable investigation by the EEOC of Tate's case would have revealed that he was in essence alleging retaliation, given that

---

[12] Of course, whatever else might be said about the administrative process in this particular case, nobody could accuse it of having been "rushed through."

his retaliation allegations concerned precisely the same incidents and decisionmakers at issue in his discrimination claims. *Cf. Chacko*, 429 F.3d at 506 (holding a plaintiff fails to exhaust when the administrative charge "reference[s] different time frames, actors, and discriminatory conduct than the central factual allegations in his formal suit"). Second, Tate expressly raised the issue of retaliation relating to those incidents during later stages of the EEOC process, such that retaliation could fairly be said to have "grow[n] out of the allegations during the pendency of the case before the agency." *Stewart*, 912 F.3d at 705. Third and finally, the Court observes that there is a line of authority in this Circuit—not cited by either party—that provides that a retaliation plaintiff is not required to specifically bring a retaliation claim in the EEOC process, so long as the retaliation complained of in federal court was related to the filing of the EEOC complaint itself. *See Stewart*, 912 F.3d at 706 (citing *Nealon v. Stone*, 958 F.2d 584, 590 (4th Cir. 1992)); *Plunkett v. Potter*, 751 F. Supp. 2d 807, 811–13 (D. Md. 2010).

For these reasons, the Court holds that Tate has adequately exhausted his administrative remedies for retaliation claims relating to all challenged incidents except for Non-Selection One.

### 2. Legal Standard for Retaliation

The Court now turns to the merits of Tate's remaining retaliation claims.

Title VII prohibits an employer from discriminating against an employee who "has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). This prohibition on retaliation is made applicable to federal employees through Title VII's federal-sector provision, 42 U.S.C. § 2000e-16. *Barbour v. Garland*, 105 F.4th 579, 589 (4th Cir. 2024).

The elements of a prima facie case of retaliation are that: (1) the plaintiff engaged in a protected activity; (2) the employer took an adverse action against him; and (3) there is a causal link between the two events. *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 271 (4th Cir.

2015) (en banc); *Laird v. Fairfax County*, 978 F.3d 887, 893 n.6 (4th Cir. 2020) (noting that the adverse action need not be an "adverse *employment* action" (emphasis added)). As is the case with discrimination, however, a plaintiff alleging retaliation need not establish the elements of a prima facie case at the motion-to-dismiss stage. *Barbour*, 105 F.4th at 590. Instead, the question before the Court is whether a complaint "allege[s] facts supporting a plausible inference that the employer took an adverse employment action against the plaintiff because of the plaintiff's protected activity." *Id.* (cleaned up). "Consequently, a claim for retaliatory non-selection will survive a motion to dismiss under Rule 12(b)(6) if the complaint's factual allegations support a plausible inference that the employer did not hire the plaintiff because of her protected activity." *Id.*

### 3.  Retaliation Analysis

#### i.  *Retaliation Claims Regarding Non-Selections Two through Eight*

SSA's merits-based argument in favor of dismissing Tate's retaliation claims relating to Non-Selections Two through Eight consists of a single short paragraph and one footnote. (*See* ECF No. 6 at 23–24.) In that paragraph, SSA asserts that Tate's retaliation claims are "deficiently pled, . . . because Plaintiff fails to allege facts sufficient to show a *prima facie* case for reprisal." (*Id.* at 23.) But as the Court has just noted, a plaintiff need not establish a prima facie case of reprisal at the motion-to-dismiss stage. As the Fourth Circuit has recently explained:

> [A] Title VII retaliation claim may survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) even if the complaint does not allege facts sufficient to establish the *McDonnell Douglas* framework's prima facie case. *See Swierkiewicz*[, 534 U.S. at 508]. Indeed, there is no requirement that the complaint contain such facts; rather, the ordinary rules apply and the complaint therefore need "contain only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Id.* (quoting Fed. R. Civ. P. 8(a)(2)). That is because the *McDonnell Douglas* framework's prima facie case "is an evidentiary standard, not a pleading requirement." *Id.* at 510. Moreover, "it is not appropriate to require a plaintiff to plead facts establishing a prima facie case because the *McDonnell Douglas* framework does not apply in every employment discrimination case," including those where the "plaintiff is able to produce direct evidence of discrimination." *Id.*

24

at 511 (further highlighting that "discovery might uncover such direct evidence" only after the complaint is filed).

*Barbour*, 105 F.4th at 590. Because SSA's argument in favor of dismissal is premised on the wrong legal standard (and even then, is cursory at best), SSA has failed to meet its initial burden, as the moving party, of showing why it is entitled to the relief it seeks. *See Gunn v. Cont'l Cas. Co.*, 968 F.3d 802, 806 (7th Cir. 2020) ("It is the defendant's burden to establish the complaint's insufficiency."); *Cohen v. Bd. of Trs. of the Univ. of D.C.*, 819 F.3d 476, 481 (D.C. Cir. 2016) (similar). Accordingly, SSA's motion to dismiss these claims will mostly be denied, without prejudice to SSA moving for dismissal at a later stage of this litigation and articulating appropriate reasons for why the claims should be dismissed.

The only exception to this conclusion is Non-Selection Six. As the Court previously noted, the Complaint does not allege that the relevant decisionmakers had any awareness of Tate's prior protected activity. (*See* ECF No. 1 ¶¶ 177–78.) Indeed, the Complaint does not even identify who the decisionmakers were. (*Id.*) Even on a liberal reading of the complaint, the bare fact that a plaintiff was not selected for a position, cannot, without more, "support a plausible inference that the employer did not hire the plaintiff because of [his] protected activity." *Barbour*, 105 F.4th at 590. Because Tate's retaliation claim as to Non-Selection Six is so obviously deficient on its face, it will be dismissed.

### ii.   *Retaliation Claim Regarding Non-Selection Nine*

Finally, the Court turns to SSA's argument in favor of dismissal of Tate's retaliation claim relating to Non-Selection Nine. SSA argues that this claim fails on the merits because he cannot show sufficient temporal proximity between the concededly protected activity (participating in EEO proceedings) and the adverse action (the denial of Tate's request for a transfer to SBA). (ECF No. 6-1 at 23–25.)

A retaliation plaintiff must establish an inference of causation between the protected activity and the adverse action. *Roberts v. Glenn Indus. Grp.*, 998 F.3d 111, 126 (4th Cir. 2021). One way to do this is by showing temporal proximity between the two events. *Id.*; *Barbour*, 104 F.4th at 593. To permit an inference of causation based on temporal proximity, the proximity in time must be "very close." *Roberts*, 998 F.3d at 126 (citation omitted). There is no "bright-line rule" as to *how* close, but the Fourth Circuit has rejected claims of retaliation when there was a three-month gap, and even a two-month gap has been held insufficient in the absence of other facts suggesting causation. *Id.* (citation omitted). *But see Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004), *abrogated on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013) (concluding that a complaint established an inference of causation when there was a gap of "nine to ten months," but noting that it was "a very close question"). Still, "in some cases, intervening events can bridge what would otherwise be a prohibitively long temporal gap." *Holloway v. Maryland*, 32 F.4th 293, 300 (4th Cir. 2022).

Here, Tate relies solely on temporal proximity to support his theory that SSA's denial of his request to be detailed to SBA was caused by his protected EEO activity. (*See* ECF No. 27 at 20.) But, the closest-in-time protected activity that Tate points to is the settlement, "in late 2016," of an EEO action involving him against SSA. This is a problem for Tate, as the SSA's denial of his detail request occurred on July 24, 2017. (ECF No. 1 ¶ 35.) So, the adverse event occurred at least six months after the last alleged protected activity. In the absence of allegations of any intervening events during that time period that would give rise to an inference of retaliatory motive on SSA's part, and in the absence of any other factual allegations suggesting causation, this time gap is too long to support an inference that the two events were causally connected. For this reason, Tate's retaliation claim as to Non-Selection Nine will be dismissed.

## V.    CONCLUSION

For the foregoing reasons, SSA's Motion, which the Court has construed as a motion to dismiss, will be granted in part and denied in part. Tate's racial-discrimination claims relating to Non-Selections One, Four, and Eight (with respect to the hiring of Suhrcke only), and Tate's retaliation claims relating to Non-Selections Two, Three, Four, Five, Seven, and Eight will continue; in all other respects the Complaint will be dismissed. A separate order will issue.

DATED this __11__ day of June, 2025.

BY THE COURT:

James K. Bredar
United States District Judge